**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **THE ESTATE OF C.A., A MINOR CHILD,** | § |
| **DECEASED, and VINCENT AND** | § |
| **CELESTINA AGWUOKE,** | § |
| **INDIVIDUALLY and ON BEHALF OF** | § |
| **THE HEIRS OF C.A.,** | § |
| **Plaintiffs** | § |
| | § |
| **vs.** | § **CIVIL ACTION NO. _____** |
| | § |
| **TERRY B. GRIER, SUPERINTENDENT OF** | § |
| **THE HOUSTON INDEPENDENT SCHOOL** | § |
| **DISTRICT, IN HIS OFFICIAL CAPACITY;** | § |
| **GREG MYERS, PRESIDENT OF THE** | § |
| **BOARD OF TRUSTEES, FOR THE** | § |
| **HOUSTON INDEPENDENT SCHOOL, IN** | § |
| **HIS OFFICIAL CAPACITY; PAUL CASTRO,** | § |
| **PRINCIPAL OF THE WESTSIDE HIGH** | § |
| **SCHOOL, INDIVIDUALLY AND IN HIS** | § |
| **OFFICIAL CAPACITY; VANESSA** | § |
| **CORONADO, INDIVIDUALLY AND IN HER** | § |
| **OFFICIAL CAPACITY and the** | § |
| **JOHN DOE COMPANY.** | § |
| **Defendants** | § |

**PLAINTIFFS ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Mr. and Mrs. VINCENT and CELESTINA AGWUOKE, individually and

the natural parents and guardians, of C.A., now deceased, now, and also in their capacity of personal

representatives of the Estate of C.A., (hereinafter collectively referred to as "Plaintiffs") complaining

of the TERRY B. GRIER, SUPERINTENDENT OF THE HOUSTON INDEPENDENT SCHOOL

DISTRICT BOARD ("Houston ISD"), in his Official Capacity; Greg Myers, President of the

BOARD OF TRUSTEES (hereinafter referred to as "The Board") for the Houston Independent

School District, In His Official Capacity; PAUL CASTRO, Individually and in his Official Capacity as Principal of the Westside High School of the Houston Independent School District; VANESSA CORONADO, Individually and in her Official Capacity as a teacher with the Defendant Houston Independent School District (and all collectively termed the "School District Defendants" herein), and the JOHN DOE COMPANY, and files this their *Original Complaint and Jury Demand* and alleges as follows:

## I.  NATURE AND PURPOSE OF THE ACTION

1.     C.A. was a senior and a high academic achiever at the Westside High School, of the Houston Independent School District.  He had already received a scholarship to attend college where he planned to study pre-medicine and later go on to be a physician.  In the spring of 2008, he took a science class that required he complete an experiment in the school's natatorium (swimming pool).  He could not swim.  He later drowned when he went into the deep end of the swimming pool, during the experiment.

2.     The use of the swimming pool at the Westside High School is scheduled by and through the school principal, Paul Castro.

3.     The teacher, Ms. Vanessa Coronado, never asked the students to have their parents sign a consent form giving their child permission to go into the swimming pool.   If she had, she would have learned from C.A.'s parents that he could not swim, which would have prevented his death.

4.     In addition, neither Coronado, nor any other teacher, supervised the program when the students, including C.A., were diving into the swimming pool. If she or any other teacher had been supervising the pool, they would have been able to prevent C.A. from jumping into the pool and later drowning.

5.      Of course, even if Coronado could not have stopped him from jumping in the pool, if she or any other teacher had been supervising the group as required, that person would have immediately observed that C.A. was in trouble after he started floundering, and then would still have been able to prevent his drowning and his death.

6.      In addition, there was no lifeguard on duty at the time the students were in the pool, nor was there any person supervising the students who was certified in water safety.  If there had been one or the other such person present to supervise the swimming pool area, then that person surely would have observed that C.A. could not swim, was drowning and would have been able to intervene accordingly, and prevent his drowning and his death.

7.      Further, there was no policy in place to assure safety in the water, like a buddy system, so that each student had one other student who was responsible for each other.  If there had been such a buddy system, then that person surely would have observed that C.A. could not swim, was drowning and would have been able to intervene accordingly, and prevent his drowning and his death.

8.      In addition, when the swimming coach came upon C.A., he first called the school nurse rather than *Emergency Medical Services*.  The School Board has developed a policy that required school personnel to first call the school nurse, have the nurse come to the scene, assess the student's medical need and then make a determination whether or not to call EMS, all to the detriment of the student.

9.      When a staff person finally was told that C.A. had drowned, the nurse who was called to the scene failed to arrange and administer emergency care in a timely manner and effective manner.  If she had, this too would have had an impact on C.A.

10.     The School District Defendants failed to have policies and procedures in place meant to

protect persons like C.A.  If they had, such policies and procedures would have prevented the death of C.A.

11.   To the extent School District Defendants did have policies and procedures in place meant to protect persons like C.A., they had a custom and practices to not follow such policies.   In fact, School District Defendants had a custom to look the other way and not to follow such policies and procedures.  If they had followed such policies and procedures, rather than certain customs, it would have prevented the death of C.A.

12.   To the extent School District Defendants did have policies and procedures in place meant to protect persons like C.A., then Defendant Coronado did not follow them.  If she had been trained on these issues than it would have prevented the death of C.A.

13.   The School District Defendants failed to assure that regular staff, including Defendant Coronado, were trained appropriately.  If they had, such policies and procedures would have prevented the death of C.A.

14.   The School District Defendants failed to assure that regular staff, including Defendant Coronado, were supervised appropriately.

15.   The School District Defendants failed to assure there was a safety plan in place at the pool, like a buddy system.  If they had, such a safety plan in place, it would have prevented the death of C.A.

16.   The School District Defendants failed to assure that swimming safety staff were trained appropriately.  If they had been correctly trained it would have prevented the death of C.A.

17.   The School District Defendants failed to assure that swimming staff were supervised appropriately.  If they had, such supervision would have prevented the death of C.A.

18.   The School District Defendants failed to assure that nursing staff were trained appropriately.

If they had, such training for nurses would have prevented the death of C.A.

19.     The School District Defendants failed to assure that nursing staff were supervised appropriately.  If they had, such supervision would have prevented the death of C.A.

20.     The School District Defendants failed to assure that emergency equipment functioned correctly. If they had assured emergency equipment was functioning correctly, it would have prevented the death of C.A.

21.     For these and other failures and violations of C.A.'s constitutional rights relative to the 14th Amendment to the United States Constitution; Plaintiffs bring this action pursuant to 42 U.S.C. §§1983.  In addition, Plaintiffs bring this action pursuant to other state and common law claims.  Last, Plaintiffs seek damages and compensation, for the injuries and actions, all more fully discussed herein.

## II.  JURISDICTION

22.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the Fourteenth Amendment to the United States Constitution and the laws of the United States.

23.     Furthermore, this Court and supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. §1367.

24.     Finally, this Court has jurisdiction to award attorneys fees, expert fees, and costs to the Plaintiffs pursuant to 42 U.S.C. §1988.

## III.  VENUE

25.     Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in Harris County.  Additionally, Plaintiffs resided in Harris County at the time.

## IV.  PARTIES

26.     C.A., when alive, was a citizen of the State of Texas, a minor, and a student with the Houston Independent School District.

27.     MR. AND MRS. VINCENT AGWOUKE are residents within the State of Texas within Harris County and sue in their capacities as C.A.'s parents, guardians, and now as personal representatives of C.A.'s estate.

28.     Defendant Mr. Greg Myers is the President of the BOARD OF TRUSTEES FOR THE HOUSTON INDEPENDENT SCHOOL DISTRICT, and is sued in his Official Capacity. The school board is a duly elected body, authorized by the State of Texas and required to follow relevant federal and state laws, and also required to develop relevant rules, policies and procedures in relation thereto.  In addition, the BOARD oversees the administration of the Houston Independent School District, and assure that such federal and state laws and rules; and policies and procedures are implemented accordingly.  Defendant Myers may be served by and through their attorney of record Ms. Janet Horton, Thompson Horton LLP, 711 Louisiana Street Suite 2100, Houston, Texas  77002-2746.

29.     Defendant TERRY B. GRIER, SUPERINTENDENT of the HOUSTON INDEPENDENT SCHOOL DISTRICT BOARD, and is sued in his Official Capacity.   The Houston Independent School District is organized pursuant to the laws of the State of Texas.  Houston ISD was at all pertinent times responsible for the care, management and control of all public school business within its jurisdiction, the training of teachers at the School as to safety and supervision of students in school natatoriums, and was the responsible recipient of federal financial assistance.  Further, they have a duty that their staff and students who develop and use school facilities (like a swimming pool), adhere to all relevant state and federal laws and

rules, municipal codes, and pool safety requirements and standards of care.  Defendant Houston ISD may be served by and through their attorney of record Ms. Janet Horton, Thompson Horton LLP, 711 Louisiana Street Suite 2100, Houston, Texas  77002-2746.

30.   Defendant PAUL CASTRO is the Principal of the Westside High School, and is responsible for the scheduling of the school's swimming pool and by extension, is required to assure its safe operation.  He is sued in both his Individual and Official Capacities.  Defendant Castro may be served by and through Ms. Janet Horton, Thompson Horton LLP, 711 Louisiana Street Suite 2100, Houston, Texas  77002-2746.

31.   Defendant VANESSA CORONADO is sued in her individual and official capacity.  She was the teacher assigned to the physics class that C.A. attended.  She exercised control over the environment in which the class was held and was directly responsible to make sure it was safe.  She may be served at her place of employment with the Tomball Independent School District at 30330 Quinn Road, Tomball, Texas 77375.

32.   Defendant John Doe Company is unknown as of this writing and will be served when its name becomes known to Plaintiffs.

## V.  STATE ACTION

33.   All the School District Defendants were at all times and in all matters acting under color of state law when they permitted C.A. to be subjected to the wrongs and injuries hereinafter set forth.  The facts occurred at a government-sponsored and licensed organization, Westside High School, within the Houston Independent School District.

## VI. STATEMENT OF FACTS

### A.     BACKGROUND

34.     C.A. was born in Nigeria.  In 2001, he emigrated with his parents to Houston, Texas, where he grew up for most of his life.  At the time of the incident that formed the basis of this complaint, he was a senior in high school and was living with his mother and father, Celestina and Vincent Agwuoke.  He was a high academic achiever at Westside High School ("Westside"), located at 14201 Briar Forest Drive, Houston, Texas  77077.  He had already been accepted to Baylor University and also had a scholarship offer from East Texas Baptist University, where he planned to go on to study medicine.

35.     During his senior year, he was in all Advanced Placement and Pre-Advanced Placement classes with the exception of one science class, Physics I, taught by Ms. Vanessa Coronado.  Around the first week in March 2008, Ms. Coronado assigned a project to the class.  The assignment required students to build boats from only cardboard and duct tape.  The students would then test the boats in the shallow end of the school pool and take data on whether they floated and for how long.  Ms. Coronado indicated the projects would be tested in the school's swimming pool.

36.     She never asked C.A. to have his parents sign a consent form giving him permission to enter the swimming pool.

**B.      MORNING OF APRIL 10, 2008**

37.     The Physics I class began at 1:45 p.m., and Ms. Coronado talked about the experiment at the beginning of class.

38.     One student, named J.B. later told the police that Coronado said that students were not permitted to go into the deep end because it was dangerous.

39.     Coronado mentioned she once had a bad experience with students who did not listen and

who had jumped into the pool anyway.

40.     Ms. Coronado was the only teacher or supervisor in the group.

41.     She had no known training from the district to conduct this experiment.

42.     Nor did she have known specific authorization to use the pool without a lifeguard present or

        someone with water safety certification.

43.     Nor did she herself have an active lifeguard certificate.

44.     Nor did she have training in cardiopulmonary resuscitation ("CPR").

45.     Nor did she  make sure that a lifeguard or a person certified in water safety was present.

46.     The students arrived into the natatorium where it was warm, humid, and well-lit.  The pool

        measured seventy-five (75) feet long by sixty-five (65) feet wide.  The south end measured

        four (4) feet deep; the north end measured twelve (12) feet deep.

47.     Plaintiffs reasonably believe the slope of the pool has a design defect.

48.     Two unmanned lifeguard chairs stood on opposite sides of the pool.  A posted sign read,

        "Warning- No Lifeguard on Duty.  Children should not use pool without adult supervision."

        Life preservers were piled in a storage corner in the far diagonal from the main entrance.

49.     There was no designated lifeguard was on duty in the natatorium.

50.     There was no designated person supervising the experiment who was certified in water

        safety.

51.     Coronado had not obtained permission slips or consent forms signed by each parent, giving

        their consent for their child to be in a swimming pool.

52.     In addition, she had not asked each student individually if they could swim.

53.     Coronado had a stated policy that students could not jump into the deep end of the pool.  But

in fact, she had a custom where after the experiments in the pool were completed, she would look the other way, and permit the students to jump and dive into the pool from the deep end. Past classes jumped off the diving boards.

54.     A tradition was started where at the end of the experiment the students would throw Coronado into the pool.  On this particular occasion, when the experiment was completed Coronado, left the area, because she did not want to get thrown in the pool and get wet.  It was during Coronado's absence that C.A. drowned.

## C.     THE VIDEO OF C.A.'S DROWNING

55.     Eventually, and just after 2:40 p.m., a review of a videotape of the drowning shows that a student propelled himself into the water.

56.     C.A. ran and jumped into lane three (3), landing about two (2) seconds after this student. Numerous other students followed.

57.     A review of the videotape shows that there are no staff members present when any of these students jumped off the deep end of the pool.

58.     The police report stated that C.A. was in immediate distress as soon as he hit the water.

59.     At about 2:41 p.m., C.A. had struggled his way to the bottom of the pool a couple lanes over, and contacted his feet with the black lane divider between lanes one (1) and two (2).

60.     For about thirty (30) seconds, he walked on the bottom and flailed away, in his attempt to reach the shallow end of the pool and survive.

61.     All the other students who had jumped in the pool had safely exited and left the area.

62.     With no other students nearby, and with the steep incline between the deep end and shallow end, C.A. made a final push with his feet, but failed to surface.

63.    He did not surface and went limp about forty (40) seconds after 2:41pm.

64.    The police report indicated that C.A. traveled about twenty (20) feet on the bottom of the pool before he tired and lost consciousness.

65.    Ms. Coronado later claimed in her statement to the police that when they were finished with the experiment, she had students walk around the pool looking for any debris left from the project in the pool.

66.    The surveillance video does not support Coronado's statement.  A review of the videotape evidences there are no students looking for debris or walking around the pool to search for debris.

67.    If there had been, certainly someone would have seen C.A. lying on the bottom of the pool, and would have rescued him and been able to begin emergency procedures much sooner.

**D.    SWIMMER AND COACH NOTICE BODY TO RESCUE**

68.    About three (3) minutes later, A.S., a student who is on the school's swim team and not in Ms. Coronado's science class, entered the natatorium.  Mr. Sikkema, the swimming team coach, opened the coach's office door and talked with A.S. in his doorway.

69.    The swimmer and Mr. Sikkema were standing near the southwestern corner of the pool on the opposite corner from C.A., as he was lying lifeless on the bottom nearest the northeast corner.  Finally Sikkema was alerted to C.A.'s body lying at the bottom of the pool and worked to bring him to the surface.

70.    Mr. Sikkema first yelled for someone to go get the nurse.  A student named T.N. was standing close by and left to get Westside High School Nurse Martha Allbright.

71.    Mr. Sikkema began CPR with working C.A.'s airways.  He wiped foam from C.A.'s mouth,

cleared his mouth of water, closed up his nose, and blew a full breath of air into C.A.'s mouth around 46 seconds after 2:45 p.m.  Then, he completed seven (7) compressions while facing Ms. Coronado, who had now come upon the scene.

72.   Sometime thereafter a student called 911.

73.   Ms. Coronado then took over the chest compressions as Mr. Sikkema was on his way to give a second breath.  Ms. Coronado did not pause to let oxygen in and gave seventy-one (71) chest compressions in a row for one (1) minute and twelve (12) seconds.

74.   Mr. Sikkema gave breaths during the second (2nd), eleventh (11th), twentieth (20th), forty-second (42nd), and sixty-sixth (66th) compression.

75.   During the second (2nd) and third (3rd) breaths into C.A.'s body, Mr. Sikkema received water and body fluids into his mouth.

## E.   NURSES' ARRIVAL AND RESUSCITATION EFFORTS

76.   Nurse Allbright arrived around at 2:47 p.m. and made her way over to the body.  She brought mouth barriers and a stethoscope to aid with CPR.  She knelt down, checked for a pulse, and put a mouth barrier on C.A.'s mouth.  She stood up.  She picked up the stethoscope to listen to his chest.  Noticing a second nurse had now walked into the main entrance, Ms. Allbright waved her hand to signal her.  Ms. Coronado sat back from kneeling and stood up.

77.   The two men in the coach's office on the west side of the pool lit up the office with a bright overhead light while they looked around.  One of the men emerged with an *Automatic External Defibrillator* ("AED").  The other man followed him out quickly.

78.   A balding man arrived and put a stretcher on the bleachers.  The first man that had left the coach's office placed the AED on the bleachers, just south of a crowd around C.A.  A tall

blond female retrieved the AED from the bleachers. She handed it to the person in blue scrubs who placed it onto the ground near C.A.'s right shoulder.

79.   Nurse Allbright moved to C.A.'s feet; then, she and members of the crowd hoisted C.A.'s body farther out of the water.

80.   An administrator joined the crowd around C.A.'s body. C.A. had not received chest compressions or mouth-to-mouth resuscitation for about three and one-half (3.5) minutes. A person in orange scrubs finally started chest compressions to resume his rescue effort. About six (6) seconds later, she breathed into C.A.'s mouth, and Mr. Sikkema took over the chest compressions. During this time, the person in blue scrubs picked up a white package and opened it with her teeth.

81.   A person in blue scrubs separated two (2) AED pads from the package she just opened. Nurse Allbright stepped over C.A.'s feet in the narrow area between his body and the pool. The person in blue scrubs attached one AED pad to C.A.'s chest.

82.   Nurse Allbright's emergency help did not achieve a pulse to return in C.A.

83.   His autopsy later confirms that he died a result of drowning.

**F.    THE PARAMEDICS ARRIVE**

84.    Personnel from the Houston Fire Department arrived at about 2:52 p.m. The first paramedic to the scene quickly unpacked his bag and removed the school's one AED pad. He attached two AED pads, asked the crowd to step back, and attempted to defibrillate C.A., all within just one (1) minute and ten (10) seconds of his arrival.

85.   Thus, the time the paramedics took to unpack, attach pads, and shock C.A. occurred in about a third of the time that the school nurses discussed for 3.5 minutes what to do next without

even giving chest compressions during those critical minutes.

86.     Nurse Allbright and the school emergency crew did not achieve shocking C.A. with an AED
at all.

87.     While talking to fire department personnel and responding to questions, Mr. Sikkema pointed
towards Ms. Coronado. The school administrator paced off to the right.  Ms. Coronado
wrung her hands and grabbed the sides of her head in her hands.

88.     A fire department crew member set down a dark box.  Other personnel began CPR again.
A fire department crew member administered oxygen.  The school administrator waded
through the emergency crew instead of going around the pool north.

G.      **DEATH PRONOUNCEMENT AT THE HOSPITAL**

89.     C.A. did not respond to CPR by emergency personnel, and a Houston Fire Department
ambulance number 86 transported C.A.'s body to Hermann Memorial City Medical Center,
where he arrived at about 3:52 p.m.

90.     His charge nurse was Nurse Wymore and attending physician was Dr. Mark Im, M.D.  He
was given cardio-arrest drugs that are consistent with a cardiac arrest victim, but he never
regained a pulse or responded to CPR at the hospital either.  Dr. Im pronounced C.A. dead
at 4:08 p.m. at Memorial City Medical Center.

91.     Inside the natatorium after C.A. was gone, Westside High School Officer Orlando Alaniz
met with an Houston Police Department ("HPD") homicide officer at the scene.  Officer
Alaniz spoke with Mr. Sikkema and took a statement.

92.     An assistant HPD chief, an HISD police department lieutenant and an HISD police
department investigator, each arrived and were briefed.  The case was turned over to HPD

homicide for further investigation.

93.     Hospital personnel called C.A.'s mother.  C.A. was positively identified by his parents in the hospital.  He was also identified in the morgue by comparing his fingerprints to prints on his resident alien card.

94.     C.A.'s death was preventable.

**H.    POST-SCRIPT**

95.     A police department spokesman stated that a review of the video evidenced that C.A. "sunk like a rock."

96.     A school district spokesman reported in the media that the teacher was in the pool area when C.A. and other students jumped into the deep end of the pool.  Even if true, the teacher obviously was not watching the pool.

97.     The school spokesman also stated, prior to the completion of an autopsy, that artificial respiration was delivered too late to save C.A.

98.     In a statement to a news station in Houston, a Houston ISD spokesperson stated that the district would review and make significant changes to its policies and procedures for student activities in pool areas and athletic facilities.

99.     Current policy requires a certified lifeguard to be on duty and not have other duties, such as teaching a class while the pool is in use.

100.    Ms. Coronado no longer works at Westside High School and has since become employed in the Tomball school district, where she does not teach physics.

**VII.  CLAIMS PURSUANT TO 42 U.S.C. §1983 AND THE 14th AMENDMENT
TO THE U.S. CONSTITUTION**

101.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and

effect as if herein set forth.

102.  The School District Defendants, acting under color of law and acting pursuant to customs and policies of the district, deprived C.A. of rights and privileges secured to him by the Fourteenth Amendment to the United States Constitution and by other laws of the United States.

103.  The School District Defendants' decision to permit C.A., a minor who cannot swim, to enter the swimming pool without necessary precautions and parental consent, constituted an actionable civil rights violation, in violation of clearly-established law.

104.  Further, it deprived C.A. of his right to life, liberty and bodily integrity guaranteed under the United States Constitution, for which School District Defendants are liable to C.A. pursuant to 42 U.S.C. §1983 for compensatory monetary damages.

## VIII.  STATE-CREATED DANGERS

105.  Plaintiffs incorporate by reference all the above related paragraphs above with the same force and effect as if herein set forth.

106.  A swimming pool is a known, obvious, dangerous and deadly environment.

107.  C.A., a person who could not swim, was required to participate in the physics class program at the school swimming pool, and left alone without teacher supervision, in this swimming pool "death trap."

108.  All the acts and omissions of each of the School Districts Defendants, as delineated herein, created a dangerous and hostile environment that, but for such failures, the death of C.A. would not have occurred.

109.  Furthermore, and at all pertinent times, such acts and omissions of the School District

Defendants increased the danger of physical harm to C.A. and constituted a dangerous environment, and comprising a state-created danger in violation of the Fourteenth Amendment of the Constitution of the United States, for which C.A. seeks recovery pursuant to 42 U.S.C. § 1983.

110.    In addition, and based upon the operative facts, such acts and omissions rise to the level of deliberate indifference, constituting a violation of the Fourteenth Amendment of the Constitution of the United States, and for which C.A. seeks recovery pursuant to 42 U.S.C. §1983.

## IX.  UNCONSTITUTIONAL POLICIES, PROCEDURES , PRACTICES & CUSTOMS

111.    Plaintiffs incorporate by reference all the above related paragraphs above with the same force and effect as if herein set forth.

112.    The Board of Trustees for the Houston Independent School District is the official policy-maker for the entire school district.

113.    The Superintendent of the Houston Independent School District is the official policy-maker for the entire school district, including and especially the Westside High School.

114.    Paul Castro, Principal of the Westside High School is an official policy-maker for the district, in regard to the scheduling and use of, the school swimming pool, and by extension, to assure it is operated safely.

115.    The School District Defendants did not have a policy of obtaining consent and permission from parents of minors who would be entering the natatorium.

116.    In the alternative, the School District Defendants had a policy of obtaining consent and permission from parents of minors who would be entering the natatorium but failed to assure

the implementation of such policy.

117.  In addition, the School District Defendants failed to have a policy that assured staff using the pool, like Defendant Coronado, were trained in pool safety.

118.  In addition, the School District Defendants failed to have a policy that assured that when students were in the pool they were correctly supervised.

119.  In addition, the School District Defendants failed to assure that policies were in place to assure that an emergency response system, with correctly trained and supervised personnel, was in place.

120.  In addition, the School District Defendants failed to assure that policies were in place to assure that an emergency response system, with correctly operating equipment, was in place.

121.  The School District Defendants failed to have policies and procedures in place to assure that an emergency system was in place in the natatorium that would easily alert supervisory staff to when a student was missing from the class, especially when the student is on the bottom of the pool.

122.  In addition, School District Defendants failed to have policies and procedures in place that required a buddy system to assure student safety during C.A.'s time in the natatorium.

123.  In addition, School District Defendants failed to have policies and procedures in place that required a lifeguard, to be present during the time C.A.'s was in the natatorium.

124.  In addition, School District Defendants failed to have policies and procedures in place that requires a person certified in water safety to be present during the time C.A.'s was in the natatorium.

125.  In addition, School District Defendants failed to have policies and procedures in place that

required a staff person to supervise the pool area that had no other responsibilities.

126.    In addition, School District Defendants failed to have policies and procedures in place that assured there be a functioning video camera system, in the office of the swim coach, or elsewhere, that would have alerted staff to the situation.

127.    In addition, School District Defendants had a custom that permitted students to dive into the deep end of the swimming pool, even though students were ostensibly not permitted to do so.

128.    In addition, School District Defendants had policies and procedures that in an emergency situation, rather than give the staff person the freedom to call *Emergency Medical Services* ("EMS") themselves, required the staff member to first contact the school nurse, have the nurse assess the need for emergency services, and only then the nurse or her designee could contact *Emergency Medical Services.*

129.    In addition, School District Defendants had a policy that required emergency medical equipment to be tested so that it would function correctly, when needed.

130.    Plaintiffs contend that these failures of the School District Defendants to have policies, procedures and practices to protect C.A. from a known and inherent dangerous situation, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

131.    Plaintiffs contend that these failures of the School District Defendants to have policies, procedures and practices in place to assure staff was correctly trained, so as to protect C.A. from a known and inherent dangerous situation, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

132.    Plaintiffs contend that these failures of the School District Defendants to have policies, procedures and practices in place to assure staff was correctly supervised, so as to protect C.A. from a known and inherent dangerous situation, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

133.    Based upon the operative facts, such acts and omissions rise to the level of deliberate indifference, constituting a violation of the Fourteenth Amendment of the Constitution of the United States, and for which C.A. seeks recovery pursuant to 42 U.S.C. §1983.

## X.  STATE LAW CLAIMS

134.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

135.    Chapter 75 of the Texas Civil Practices & Remedies Code holds a school district liable being grossly negligent, and in the alternative acting wantonly, in regard to a known and inherent dangerous condition at the swimming pool, where C.A. drowned.

136.    Pursuant to Chapter 75 of the Texas Civil Practices & Remedies Code, the School District Defendants are liable to C.A., for the wanton acts, noted above.

## XI.  RATIFICATION

137.    The School District Defendants ratified the acts, omissions and customs of school district personnel and staff, including and especially teacher Vanessa Coronado and Nurse Martha Allbright.

138.    As a result the School District Defendants are responsible for the acts and omissions of Coronado, Allbright and others.

## XII.  CLAIM FOR DAMAGES FOR WRONGFUL DEATH

139.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

140.    This claim for damages resulting from the wrongful death of C.A. is brought by his surviving mother and father, pursuant to Tex. Civ. Prac. & Rem. Code, 71.001 et. seq.  This claim is based upon the facts and legal theories more fully set out herein.

141.    At the time of death, the decedent was otherwise in reasonably good health with a normal life expectancy.

142.    The decedent was a loving and dutiful child and provided reasonable services to his mother and father, which is particularly true in the native Nigerian culture and community.

143.    As a result of the wrongful death of C.A., his mother and father did suffer damages, including termination of the parent-child and familial relationship and severe mental anguish, and will, in reasonable probability, continue to suffer damages in the future as a direct result of the wrongful death of C.A., in an amount within the jurisdictional limits of the court.

144.    Plaintiffs contend that these failures of the School District Defendants are liable to Plaintiffs for the wrongful death of C.A.

## XIII.  SURVIVAL CLAIMS FOR INJURIES TO C.A.

145.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

146.    This claim for damages resulting from the death of C.A. is brought by his surviving parents who are the personal representatives of his estate. This claim is based upon the facts and legal theories more fully set out herein.

147.    Any person required to be a named Plaintiff in this lawsuit to collect damages under Section 71.021, Tex. Civ. Prac. & Rem. Code, is a named Plaintiff, or will be added accordingly.

Plaintiffs bring this survival action pursuant to Tex Civ. Prac. & Rem. Code, Section 71.021, because of personal injuries suffered by the decedent, which resulted in his death, based upon the facts and legal theories more fully set out above.

148.    Plaintiffs seek damages for the conscious pain and suffering and mental anguish that the decedent suffered prior to death and for the reasonable and necessary medical, funeral and burial expenses which were reasonably incurred because of such wrongful death.

149.    Plaintiffs seek damages within the jurisdictional limits of the court from the School District Defendants.

## XIV.  PROXIMATE CAUSE

150.    Plaintiffs incorporate by reference all allegations the above related paragraphs with the same force and effect as if herein set forth.

151.    Each and every, all and singular, of the foregoing acts and omissions, on the part of Defendants taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XV.  ATTORNEY AND EXPERT FEES

152.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

153.    It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit.  Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. §1988(b).

154.    As well, it was necessary for Plaintiffs to hire an expert in swimming pool safety, especially with respect to the school swimming pool at Westside High School to file this lawsuit.  Upon judgment, Plaintiffs are entitled to an award of expert fees pursuant to 42 U.S.C. §1988( c).

## XVI.  DAMAGES

155.  Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

156.  As a direct and proximate result of the Defendants' conduct, C.A. and his family has suffered injuries and damages, which he, by and through his personal representative, may seek compensation thereby, all within the jurisdictional limits of this court, including but not limited to the following:

a.      Reasonable medical care and expenses in the past. These expenses were incurred by the subject of this lawsuit, for the necessary care and treatment of the injuries resulting from the accident complained of herein and such charges are reasonable and were usual and customary charges for such services in Harris County, Texas;

b.      Physical pain and suffering in the past;

c.      Mental anguish in the past;

d.      Mental anguish of his parents in the future;

e.      Physical impairment leading to death in the past;

f.      Loss of Consortium in the past, including damages to the family relationship, loss of care, comfort, solace, companionship, protection, services, and/or physical relations;

g.      Loss of Consortium in the future of all Plaintiffs, including damages to the family relationship, loss of care, comfort, solace, companionship, protection, services, and/or physical relations;

h.      Disfigurement in the past; and

i.      Loss of Wages in the future.

157.  By reason of the above, the subject of this lawsuit, Plaintiffs have suffered losses and

Original Complaint                                                                                        23

damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

## XVII.  PUNITIVE DAMAGES

158.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

159.    Review of the acts and omissions of the School District Defendants, evidence that they have been consciously indifferent, deliberately indifferent, and acted with wanton disregard to the safety of C.A. by failing to have in place the simple and inexpensive safety measures that if provided, would have acted to assure the life, liberty and continued happiness of C.A. and not his untimely drowning and resultant death.

## XVIII.  DEMAND FOR JURY TRIAL

160.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the School District Defendants, jointly and severally, in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorneys' fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to 42 U.S.C. §1988 and the pendant state and common law claims; together with pre- and post-judgment interest, and court costs expended herein, punitive damages and for such other relief as this Court in equity, deems just and proper.

Respectfully submitted,

Cirkiel & Associates, P.C.

_____

/s/ Mr. Martin J. Cirkiel, Esq.
Martin J. Cirkiel
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
State Bar No. 00783829
Fed. ID No. 21488


Mr. Michael Zimmerman, Esq.
The Zimmerman Law Firm
301 W. Waco Drive
Waco, Texas  76710
(254) 752-9688 [Telephone]
(254) 752-9680 [Facsimile]
MZimmerman@theZimmemanLawFirm.com
[Email]

ATTORNEYS FOR PETITIONERS