IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE ESTATE OF C.A., A MINOR CHILD, DECEASED, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-10-00531 |
| TERRY B. GRIER, SUPERINTENDENT OF THE HOUSTON INDEPENDENT SCHOOL DISTRICT, IN HIS OFFICIAL CAPACITY, *et al.*, | § § § § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

C.A., a 17-year-old senior at a high school in the Houston Independent School District, drowned in the school's swimming pool during a physics class in which students went into the pool as part of an experiment. C.A.'s parents and estate have sued HISD and individual employees under 42 U.S.C. § 1983. Two of the defendants, Paul Castro, the former principal of the high school, and Vanessa Coronado, the science teacher who taught the class, moved for summary judgment that they are not liable in their individual capacities, based on qualified immunity. (Docket Entry No. 68). The plaintiffs responded, (Docket Entry No. 88), and Castro and Coronado replied, (Docket Entry No. 96). This court allowed discovery targeted to the qualified-immunity defense. Based on the record; the motion, response, and reply; the arguments of counsel; and the relevant law, this court grants the motion for summary judgment based on qualified immunity. A status conference is set for **September 20, 2011, at 8:30 a.m.** in Courtroom 11-B.

The reasons are explained in detail below.

**I.      Background**[1]

In 2008, C.A. was a senior in Westside High School's Magnet Program for Integrated Technology. He was enrolled in Coronado's Physics I class. (Docket Entry No. 68, Ex. 1, ¶ 6). Coronado had been teaching science classes, including junior- and senior-level physics, at Westside since the fall of 2004. The physics class included a buoyancy experiment. (*Id.*, ¶ 3). Coronado worked with Troy Gillespie, another physics teacher who had been teaching at Westside longer than Coronado, on the buoyancy experiment. Gillespie had assigned the experiment to his classes before Coronado began teaching at the school, and the two teachers decided to include it in the spring-2008 curriculum. (*Id.*).

In the experiment, each class was divided into teams of three to four students. Each team built a four- to ten-foot-long boat using cardboard and duct tape. (*Id.*, ¶¶ 4–5). Designing and building the boats took several weeks. After building the boats, the teams were assigned time in the school swimming pool to test the boats in the water. One or more students from the team would be in the boat and another student would be in the pool to guide the boat across the shallow end. Two

---

[1] This account of C.A.'s death is based on the summary-judgment record, which contains the following: the affidavit of Vanessa Coronado and accompanying exhibits, (Docket Entry No. 68, Ex. 1; Docket Entry No. 88, Ex. E (affidavit only)); the affidavit of Paul Castro and accompanying exhibits, (Docket Entry No. 68, Ex. 2; Docket Entry No. 88, Ex. E (affidavit only)); the affidavit of Craig Sikkema and accompanying exhibits, (Docket Entry No. 68, Ex. 3; Docket Entry No. 88, Ex. E (affidavit only)); the affidavit of Troy Gillespie and accompanying exhibits, (Docket Entry No. 68, Ex. 4; Docket Entry No. 88, Ex. E (affidavit only)); HISD's swimming-pool policy, (Docket Entry No. 88, Ex. A); HISD's policy on school principals' responsibilities, (*id.*, Ex. A[i]); Westside High School's building permit, (*id.*, Ex. A[ii]); Westside High School's swimming-pool permit, (*id.*, Ex. A[iii]); Houston's swimming-pool ordinance, (*id.*, Ex. B); the police report about C.A.'s death, (*id.*, Ex. C); Coronado's deposition transcript, (*id.*, Ex. D); a video recording of C.A.'s drowning, (*id.*, Ex. F); a photograph of the no-diving signs at Westside High School's swimming pool, (*id.*, Ex. G); West Houston Aquatic League's swimming-pool listing, (*id.*, Ex. H); North Houston Water Polo's swimming-pool listing, (*id.*, Ex. I); and Westside High School's 2010–2011 Student/Parent Handbook, (*id.*, Ex. J).
      The individual defendants filed numerous objections to the plaintiffs' evidence. (Docket Entry No. 96-1). Because this court determines that summary judgment is appropriate even when taking all of the plaintiffs' evidence into consideration, it is unnecessary to consider Castro and Coronado's objections. Similarly, many of the facts in the summary-judgment record are subject to dispute. Because these disputes do not affect the analysis or outcome of the legal issues, it is unnecessary to resolve them.

boats would be in the water at one time. The purposes of the experiment were to test the buoyancy and to have the students calculate the buoyancy needed to carry the weight in the boat. (*Id.*, ¶¶ 5, 8–9).

The pool part of the experiment took place on April 10, 2008. During the planning, Gillespie and Coronado discussed safety guidelines. The guidelines included having the pool supervised by a swim-team coach; instructing students who could not swim that they should not be in the pool; and having the boats stay in the shallow end. (*Id.*, ¶ 3.) Coronado testified that she sent two emails before the scheduled date, notifying parents about the experiment. The emails told the parents to contact her with any questions. Coronado did not require the students to bring signed permission slips for various reasons, including that the students were all juniors or seniors. (*Id.*, ¶ 6). C.A.'s mother received the email from Coronado and responded, telling her that C.A. was excited about the project. C.A.'s mother made no reference to his inability to swim or to any concern about his being in the pool. (Docket Entry No. 68, Ex. 1-D).

The plaintiffs assert in their response to the summary-judgment motion that C.A.'s parents had previously provided a document to HISD specifically stating that they did not want their son to be swimming or diving in the pool. (Docket Entry No. 88, pp. 8, 35). The plaintiffs assert that the document was a "preparticipation physical evaluation form," apparently related to athletics. As the defendants point out, however, the plaintiffs did not submit any such document with their response. There is no such document in the record. There is uncontroverted evidence in the record that Coronado, a science teacher who would not have received documents directed to the athletics department, did not know of C.A.'s inability to swim. (Docket Entry No. 68, Ex. 1, ¶ 11). It is also undisputed that before the experiment began, Coronado instructed her students not to go in the pool

3

if they could not swim, (*id.*, ¶ 8), although there is conflicting evidence as to whether she gave different instructions after the experiment was over and the students were supposed to be cleaning up.

The evidence shows that in preparing her students for the pool experiment, Coronado went over safety guidelines in class. Coronado told the students to remain in the shallow end of the pool so that if they fell out of the boats, they would be able to hold their heads above water. (*Id.*, ¶¶ 8, 11). When Coronado instructed students who could not swim not to get into the pool, C.A. did not tell her he could not swim. (*Id.*). The evidence shows that several students participated in ways that did not require them to get in the pool. Some students participated by writing the report. Other students cheered the team from the bleachers. Coronado excused at least one student from participating in the pool section of the project and allowed her to participate in a blood drive instead. It appears that there was some impact on the individual grade for those who did not directly participate in the pool portion of the experiment, but each student also received a group grade for team participation and the impact on the overall grade of not participating in the pool portion is unclear. (*Id.*, ¶¶ 9–10).

The day of the experiment, Coronado again talked to the students about safety before they went to the swimming pool. She instructed them to stay in the shallow end and not to go into the deep end. She told students that one year, a student had fallen out of the boat during the same experiment and had swallowed and choked on water, emphasizing why each student needed to be able to touch the floor of the pool at all times. She again told students that if they could not swim or had given blood in the blood drive, they should stay out of the pool. (*Id.*, ¶ 11).

Coronado had a strong background in water-safety training. She was a certified lifeguard

4

in college, although her certification had lapsed and she was not certified when C.A. drowned. (*Id.*, ¶ 1). Gillespie apparently arranged for the school's swim coach, Craig Sikkema, to be at the pool during the experiment. (*Id.*, ¶ 12). It is undisputed that Sikkema had extensive training and experience in water safety and held current relevant certifications. (Docket Entry No. 68, Ex. 3, ¶¶ 1–4). It is also undisputed that, following the arrangements Coronado and Gillespie had discussed and that Gillespie had made before the experiment began, Sikkema was present during the experiment itself, watching the pool. He left, however, when the experiment was over and the clean-up had begun. (*Id.*, ¶¶ 6–7.)

The evidence as to the events immediately preceding C.A.'s death are vigorously disputed. The plaintiffs rely on statements from students included in the documents of the investigations by the Houston Police Department and by Westside. As the defendants point out, some of the statements are inconsistent with one another, (*e.g.*, Docket Entry No. 88, Ex. C., at 70 ("[Coronado] told everyone not to go in the deep end"); *id.*, at 57 ("[Coronado] said we could do cannonballs [in the deep end], but could not jump off the diving board"); *id.*, at 52 (according to Coronado, one student asked her if students could race in the pool, but "[t]hey all knew not to go to the deep end")). The defendants also point out that in at least one instance, the same student gave inconsistent statements, (*compare id.*, at 62 (when students asked Coronado if they could jump in the deep end, she said yes); *with id.*, at 69 (when students asked, she said no)). The primary inconsistencies surround whether, after the experiment ended and the boats were out of the water, Coronado permitted the students to swim in the deep end of the pool. The plaintiffs also rely on a swimming-pool surveillance videotape record of the incident. (Docket Entry No. 88, Ex. F). There is no audio portion to the videotape.

5

The evidence shows that C.A. disregarded the instructions he previously had been given by getting into his team's boat, despite his inability to swim. There is evidence that while he was in the boat during his team's turn, C.A. told one of the other students he could not swim. (Docket Entry No. 88, Ex. C, at 54, 67). But there is no evidence that C.A. or anyone else relayed this information to Coronado or any other adult at the pool. The boat C.A. and three other students were in capsized during the experiment. C.A. was able to jump out and stand in the shallow end while the boat was carried out of the pool. After the experiment on his team's boat had been completed, C.A. was standing in the shallow end of the pool. He got out of the pool safely. (*Id.*, at 53–54).

The videotape shows that in between each team's turn, and after C.A. had left his boat, some students began "horseplaying" in the water. C.A. was one of the students splashing in the shallow end. When the last boat was in the water, some of the students began doing "cannonball" jumps in the water. While this was going on, C.A. was out of the pool, walking on the side. He stopped to talk with some students and with Coronado. (Docket Entry No. 88, Ex. F).

The plaintiffs have submitted evidence in the form of statements by some of the students present that they asked Coronado if they could jump in the deep end, and that she permitted them to do so as long as they stayed off the diving board. (Docket Entry No. 88, Ex. C, at 55, 57, 62, 74). Coronado has vigorously disputed this evidence and the defendants have objected to the inconsistencies among the students' statements. Some of the students stated that Coronado explicitly limited this permission to those students who knew how to swim. (*Id.*, at 66, 73, 77, 81). Other students stated that Coronado gave permission to swim in the shallow end but told them not to go in the deep end. (*Id.*, at 60, 70). There is no evidence that, during these exchanges, any student told Coronado that C.A. did not know how to swim.

6

More students began jumping into the deep end. Several students jumped together, in a group. C.A. was among them. There is no evidence that he was pushed or forced in any way. He jumped voluntarily. (Docket Entry No. 88, Ex. F).

C.A. did not surface after he jumped into the deep end. The other students left the pool area, apparently without noticing that C.A. was still in the pool. The surveillance video showed that the students jumped into the pool at 2:40 p.m. At 2:36 p.m., Sikkema had left the pool area because the experiment was over. At 2:44 p.m., Sikkema was talking to another student near the southwest corner of the pool area when they noticed something on the pool bottom. Coronado approached from the opposite direction. She and the student with Sikkema both dove in and pulled C.A. from the water. Sikkema began CPR. At 2:47 p.m., the school nurse arrived, then others. Chest compressions and an AED were used, without success. Paramedics arrived at 2:52 p.m. (*Id.*). C.A. was declared dead in the hospital at 4:08 p.m.

C.A.'s estate and parents, Vincent and Celestina Agwuoke, sued, among others, Coronado and Westside's principal, Castro. The evidence as to Castro shows no direct involvement in the physics experiment. The evidence does show that Castro met with Gillespie to satisfy himself that the experiment was properly planned and that prior problems of wet cardboard left in the pool would be avoided. Castro had delegated responsibility for the pool area to Sikkema, who was a certified and trained swim coach. (Docket Entry No. 68, Ex. 2, ¶¶ 2, 4–6).

The third amended complaint asserts Fourteenth Amendment violations under 42 U.S.C. § 1983 and state-law violations. (Docket Entry No. 32). At a September 16, 2010 hearing, the plaintiffs withdrew their state-law claims. (Docket Entry No. 64). After targeted discovery on issues of qualified immunity, Castro and Coronado moved for summary judgment that they are not

liable for damages in their individual capacities. The parties' arguments are addressed below.

## II.     The Summary-Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary-judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied

by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

"Section 1983 provides a cause of action when a person has been deprived of federal rights under color of state law." *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 456 (5th Cir. 2010) (citing *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998)). Nonetheless, the doctrine of qualified immunity shields federal and state officials from money damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). The Supreme Court recently clarified that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" *al-Kidd*, 131 S. Ct. at 2080 (quoting *Pearson*, 555 U.S. at 236–37). It is most appropriate to decide whether a legal violation took place when, as here, evaluating the "clearly established" prong would not conserve judicial resources or when a case presents "questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 555 U.S. at 236. This court first considers whether there was a constitutional-rights violation.

The plaintiffs argue that Coronado and Castro violated C.A.'s "right to expect that school

9

officials will follow city ordinances and their own standard internal policies directly applicable to the situation at hand when they are the officials charged under the laws, regulations and policies with the obligation to comply." (Docket Entry No. 88, at 31). The plaintiffs base their argument on a City of Houston ordinance and on the HISD written policies governing school swimming pools. Under Houston's 2008 ordinances, "[i]t shall be the duty of the owner of each public pool to ensure that at least one lifeguard is on duty and is stationed within 20 feet of the water's edge of the pool at any time that the pool is open for use." HOUSTON, TEX. CODE OF ORDINANCES § 43-22(e) (2008).[2] HISD has a Standard Practice Manual that includes "Guidelines for the Operation and Care of Swimming Pools." (Docket Entry No. 88, Ex. A).[3] These guidelines state that HISD pools "are available . . . to the general public." (*Id.*). Therefore, according to the plaintiffs, HISD pools were required to comply with all city ordinances, including the one requiring a lifeguard to be stationed near the pool's edge. (Docket Entry No. 88, at 32). The plaintiffs contend that because Castro and Coronado did not comply with that obligation, C.A. was deprived of his right to have these officials act in conformity with the ordinances and policies governing swimming-pool use.

The plaintiffs concede that they cannot recover on a claim that the defendants had a constitutional duty to protect C.A. based on either a special-relationship or a state-created-danger theory. *See DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 201–02 (1989). The plaintiffs instead contend that the allegations that C.A. had a general right to be free from death at the hands of the government, combined with the more specific requirements under the ordinance

---

[2] This ordinance has since been repealed. *See generally* HOUSTON, TEX. CODE OF ORDINANCES § 43 (2011).

[3] The plaintiffs, in opposing summary judgment, also refer to superseding memoranda. These memoranda, however, were issued on February 19, 2009 and June 23, 2009. (Docket Entry No. 88, Ex. A). The policies contained in these memoranda thus were not in effect when C.A. drowned.

10

and the swimming-pool policy, make out a violation of a constitutional right that precludes summary judgment based on qualified immunity. (Docket Entry No. 88, at 33).

The plaintiffs' primary argument focuses on the Houston ordinance and the HISD policies on swimming-pool use. To the extent that the plaintiffs contend that violations of state laws, without more, constitute § 1983 violations, they are incorrect. "It is well established that violations of state law are not actionable under § 1983." *Whitt v. Stephens Cnty.*, 236 F. App'x 900, 902 (5th Cir. 2007) (citing *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 n.4 (5th Cir. 1991)); *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000); *Bush v. Viterna*, 795 F.2d 1203, 1208–09 (5th Cir. 1986) (citing *Stern v. Tarrant Cnty. Hosp. Dist.*, 778 F.2d 1052, 1056–60 (5th Cir. 1985) (en banc)); *Williams v. Treen*, 671 F.2d 892, 900 (5th Cir. 1982).

To the extent that the plaintiffs contend that the ordinance and the HISD policies create interests protected by the Fourteenth Amendment, the argument fails as a matter of law. The plaintiffs have not provided a basis to conclude that the ordinance or policy creates an individual entitlement. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 765–66 (2005). The plaintiffs neither recognize this requirement nor attempt to make this showing. The Supreme Court has explained that "[m]aking the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people." *Id.* at 765 (citing *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). Assuming, without deciding, that the ordinance and HISD policy required lifeguards and other safety features at the pools, they do not create a personal entitlement enforceable under the Fourteenth Amendment. Nothing in their terms suggests that they create individually enforceable entitlements. *See id.* ("If [the plaintiff] was given a statutory entitlement, we would expect to see some indication of that in the statute itself."). To the contrary,

the then-existing Houston ordinance provides an administrative remedy of permit suspension or revocation for ordinance violations, not a private action. HOUSTON, TEX. CODE OF ORDINANCES § 43-24 (2008); *see also Castle Rock*, 545 U.S. at 765–66 (reasoning that a statute did not create an enforceable benefit when it provided an administrative remedy but no private right of action).

In *Langan ex rel. Langan v. Grand Rapids Public School System*, No. 94-CV-174, 1995 WL 17009502 (W.D. Mich. Feb. 28, 1995), the plaintiffs made a similar argument. In that case, a child suffered paralysis after diving from a starting block into the shallow end of a school pool. He sued the school district under § 1983, alleging a constitutional violation. He specifically contended that the placement of the starting blocks in shallow water, the failure to remove the blocks while not in use, and the failure to have a lifeguard on duty violated policies and recommendations of the Michigan Public Health Department, the Michigan High School Athletic Association, and state law. *Id.* at *1. The court held that the failure to follow state law did not violate the due-process clause. The court explained that the school system's failure to implement safety procedures in the school swimming pool, including procedures required by state law, was "a fairly typical state law tort claim," not a substantive-due-process claim that "require[d] an intentional infliction of injury, or some other governmental action that is 'arbitrary in the constitutional sense.'" *Id.* at *4 (quoting *Lewellen v. Metropolitan Gov't*, 34 F.3d 345, 351 (6th Cir. 1994) (workman injured on school-construction site sued the school district under § 1983 for ordering construction so close to a live power line that the construction violated safety and electrical codes; the court found no constitutional right violated because, although the defendants were negligent and perhaps grossly so, they did not "engage in arbitrary conduct intentionally designed to punish")).

Here, as in *Langan*, even assuming that Castro and Coronado violated the swimming-pool

policy by failing to comply with Houston's lifeguard ordinance, that violation did not run afoul of C.A.'s substantive-due-process rights. The plaintiffs do not contend that Castro or Coronado intentionally engaged in conduct that would lead to C.A.'s death, or that their conduct was constitutionally arbitrary. Rather, the plaintiffs' complaint essentially presents a state-law claim for gross negligence, not a § 1983 claim for a violation of constitutional rights.

The plaintiffs make clear in their response that they do not rely on other constitutional rights theories commonly asserted by individuals suing under § 1983 to recover for the government's failure to protect them from harm. The plaintiffs explicitly concede that they cannot defeat qualified immunity through pleading a special-relationship or state-created-danger theory. (Docket Entry No. 45 at 34); *see also Kovacic v. Villarreal*, 628 F.3d 209, 214–15 (5th Cir. 2010) (noting that the Fifth Circuit recognizes the first theory in limited circumstances but has not yet addressed the second); *accord Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Bd. of Educ.*, — F.3d —, 2011 WL 3375531, at *25 (5th Cir. 2011) (King, J., dissenting) (noting that the Fifth Circuit has not adopted the state-created-danger theory). The plaintiffs also disavow reliance on the "shock the conscience" theory. (Docket Entry No. 88, at 38–39); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–50 (1998).[4]

The conclusion that, as a matter of law, the plaintiffs have failed to make out a constitutional violation is consistent with other decisions declining to recognize a constitutional violation in cases

---

[4] After the briefing was complete, the Fifth Circuit held that "a very young child in the custody of a compulsory-attendance public elementary school is necessarily in a special relationship with that school when it places her in the absolute custody of an unauthorized private actor." *Doe*, 2011 WL 3375531, at *14. Unlike *Doe*, in which the school repeatedly placed a nine-year-old fourth grader in the custody of a stranger who raped her, the conduct at issue in this case is, at most, allowing a high-school senior to swim in a pool without having adequate safeguards in place or confirming his ability to swim. Moreover, *Doe* was based on the special-relationship theory of substantive due process that the plaintiffs here have acknowledged does not apply. *Doe* does not affect Castro's and Coronado's entitlement to qualified immunity.

13

involving drownings in public swimming pools or beaches. Most of the cases arise under a substantive-due-process theory. "There is a recognized substantive due process right for individuals to be free from bodily harm caused by the state, but as a general rule, there is no constitutional duty that requires state officials to protect persons from private harms." *Kovacic*, 628 F.3d at 213. Courts have suggested that the Fourteenth Amendment does not require the government to rescue drowning victims, even when the drowning occurs in a public location where government employees are working as lifeguards. *Hamilton ex rel. Hamilton v. Cannon*, 80 F.3d 1525, 1529–32 (11th Cir. 1996) (municipal pool); *Darwick v. Village of Penn Yan*, 972 F. Supp. 166, 169–70 (W.D.N.Y. 1997) (public beach). Nor is there a right to competent rescue once the government begins rescue efforts. *See Brown v. Pa. Dep't of Health and Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003) ("[T]here is no federal constitutional right to rescue services, competent or otherwise."); *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991) ("Government generally has no constitutional duty to provide rescue services to its citizens, and if it does provide such services, it has no constitutional duty to provide competent services to people not in its custody."); *Bradberry v. Pinellas Cnty.*, 789 F.2d 1513, 1517 (11th Cir. 1986) ("The Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts . . . .").

Here, the plaintiffs do not quarrel with the rescue efforts once begun; instead, they argue that Castro and Coronado's failure to ensure that the pool was monitored at all times, so as to be in compliance with the school policy and city ordinance, violated C.A.'s due-process rights. But that failure is not a constitutional violation. Although the state may have required Castro and Coronado to provide some form of lifeguard, the Due Process Clause of the Constitution did not impose this requirement, even though the school swimming pool is a public one. And although C.A. had the

right under the Due Process Clause not to have Castro and Coronado affirmatively act to cause his death, *see Kovacic*, 628 F.3d at 213; the plaintiffs neither allege nor argue such an affirmative act.

Other cases emphasize that a failure to act—including a failure to adequately monitor children in public pools or beaches, a failure to comply with local ordinances or state laws requiring certain safety measures to be in place, or a failure to provide a lifeguard—is not the type of affirmative government act that gives rise to a constitutional deprivation. In *DeAnzona v. City and County of Denver*, 222 F.3d 1229 (10th Cir. 2000), a five-year-old child drowned while participating in a in summer program sponsored by the city. The drowning occurred after a counselor turned her back on the child as the child walked toward a group of children fishing with two other counselors. The child apparently never reached that group, and his body was discovered the next day in the lake. The district court denied qualified immunity for the manager of the city's parks-and-recreation department. The Tenth Circuit reversed and granted summary judgment. In doing so, it stated as follows: "Not paying enough attention to a child and thus allowing the child to wander away and drown is terribly tragic, and possibly even negligent. However, mere negligence does not shock the conscience." *Id.* at 1236 (citing *DeShaney*, 489 U.S. at 202); *see also Rankin v. City of Wichita Falls, Tex,*, 762 F.2d 444, 447–48 (5th Cir. 1985) (suit by parents of man killed when he drowned in a waste-treatment tank, alleging that the City's plant contained numerous safety deficiencies that proximately caused the death; the court held that it could not equate tort-law violations by state actors with constitutional deprivations and dismissed the complaint). Similarly, in *Bradberry v. Pinellas County*, the mother of a swimmer who drowned at a beach owned by the county sued under § 1983. The court held that the county's failure to provide adequately trained lifeguards did not violate the swimmer's constitutional rights. The court emphasized that the allegations involved

merely a failure to assist effectively or competently, and that allegations of "essentially inaction" are "remote from the concerns of the framers of the Fourteenth Amendment." 789 F.2d at 1517. The court emphasized that this distinguished the case from those involving a government entity alleged to have grossly negligently trained an agent who then takes "affirmative action" causing harm. *Id.*; *cf., e.g.*, *Ross v. United States*, 910 F.2d 1422, 1424–25, 1431 (7th Cir. 1990) (mother of child who slipped on a crack in the breakwater, fell into lake, and drowned sued government entities based on an alleged policy directing the sheriff's department to prevent any civilian from attempting to rescue someone in danger of drowning in the lake; the court held that this stated a constitutional claim because this was not merely a failure to provide services or a failure to rescue, but rather an affirmative act of cutting off private sources of rescue without providing a meaningful alternative).

The plaintiffs' argument is that Castro and Coronado's failure to ensure adequate monitoring of the pool, as required by the HISD swimming-pool policy and the Houston ordinance, violated C.A.'s substantive-due-process rights. The case law makes clear that this argument is insufficient; a successful substantive-due-process claim in this context requires that the public employees must have affirmatively acted to cause harm. There is no evidence of such an affirmative act. *See, e.g.*, *Bradberry*, 789 F.2d at 1517. Even assuming that Castro and Coronado negligently failed to follow state law and that Coronado negligently permitted her students to swim in the deep end, notwithstanding her earlier safety instructions, the plaintiffs cannot, as a matter of law, show a violation of C.A.'s substantive-due-process rights.

Finally, in *Leo v. Trevino*, 285 S.W.3d 470 (Tex. App.—Corpus Christi 2006 no pet.), the parents of a child who drowned on a school field trip sued the school district and individual defendants for failing to supervise properly the students and not hiring lifeguards. Applying Fifth

16

Circuit precedent and relying on the Tenth Circuit's analysis in *DeAnzona*, the court held that neither the special-relationship nor the state-created-danger doctrine applied. The student's school attendance was insufficient to show a special relationship, *id.* at 486–87, and the alleged misconduct of failing to supervise adequately did not demonstrate deliberate indifference. *Id.* at 489–90. In the present case, the plaintiffs recognize that they cannot assert a special-relationship theory. And, as in *Leo*, Castro and Coronado's failure to ensure adequate safeguards for the pool experiment may demonstrate negligence, but it does not demonstrate deliberate indifference.

The evidence, taken in the light most favorable to the plaintiffs, fails to show that Castro or Coronado violated C.A.'s constitutional rights through their roles in C.A.'s drowning. Castro and Coronado are entitled to summary judgment on the basis of qualified immunity.

**IV. Conclusion**

The motion for summary judgment is granted. A status conference is set for **September 20, 2011, at 8:30 a.m.** in Courtroom 11-B.

SIGNED on September 6, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge